UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KENNETH A. KEELEY,

      Plaintiff,

v.                                     Case No. 2:08-cv-111
                                       HON. R. ALLAN EDGAR

AIRGAS, INC.,

      Defendant.

_____/

**MEMORANDUM**

Plaintiff Kenneth Keeley brings this action against Defendant Airgas, Inc. ("Airgas") alleging breach of contract, as well as violations of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"), federal and state securities laws, and state conversion and misrepresentation laws. [Court Doc. No. 4, Complaint]. Airgas moves for dismissal pursuant to Federal Rule of Civil Procedure 12(b) for both lack of personal jurisdiction and improper venue. Fed.R.Civ.P. 12(b)(2)-(3). [Court Doc. No. 13]. Airgas moves, in the alternative, to strike Plaintiff's jury demand. *Id.*

The court has reviewed the record, the arguments of the parties, and the applicable law. Based on this review, the court concludes that Airgas' motion will be **DENIED**.

**I.      Background**

Plaintiff's Complaint alleges that in March of 1984, Airgas bought two companies, Mid-Michigan Welding Supply, Inc. and Valley Oxygen, Inc. from Plaintiff. Complaint, ¶ 4. Plaintiff then worked for Airgas in Bay City, Michigan from March of 1984 until his retirement in May of 1997. *Id.* at ¶ 5. He contends that he received stock options pursuant to Airgas' 1984 Stock

Option Plan ("Stock Option Plan"), and that among those options were ones dated May 12, 1994, May 22, 1995, and May 24, 1996.  These options had a 10-year life span pursuant to the Stock Option Plan.  *Id.* at ¶ 6.  Generally, Airgas notified Plaintiff shortly before the expiration of the options so that he had the opportunity to exercise them.  However, with respect to the May 1995 options, Plaintiff alleges that Airgas did not notify him prior to their expiration.  *Id.* at ¶ 7.

Plaintiff asserts that on the date of issue of the May 1995 options, the Stock Option Plan stated:

> If any Optionee retires in accordance with the retirement policy of the Company, or with the express consent of the Board, and his employment with the Company and all related corporations is terminated as a consequence of such retirement prior to the Expiration date of his Option, such option may be exercised by the Optionee, to the extent of the number of Shares with respect to which the Optionee could have exercised it on the date of his retirement, or to any greater extent permitted by the Committee, pursuant to subsection (c) above, at any time prior to the earlier of (i) seventy-five (75) days after the retirement or (ii) the Expiration date of such Option.

Complaint, ¶ 8.   According to Plaintiff the Airgas shareholders amended the Stock Option Plan to extend the period of time during which an optionee could exercise stock options from 75 days after the date of retirement to "any time prior to the Expiration date of such option."  He contends that this and other allegedly material amendments to the Stock Option Plan, of which he never received information or constructive or actual notice, caused him consequential damages of over two million dollars.  Plaintiff brings claims for breach of express and implied contract, violations of ERISA, violations of federal and state securities law, and claims of conversion, and misrepresentation and fraudulent concealment.

In moving for dismissal for lack of personal jurisdiction, Airgas has filed the affidavit of Robert H. Young, Jr.  The affidavit states in full that:

> I am employed as General Counsel of Airgas, Inc., and have the authority to sign this affidavit on behalf of Airgas, Inc.  Airgas, Inc. owns stock in a subsidiary corporation, Airgas-Great Lakes, Inc., which was incorporated as Michigan Airgas, Inc., a Delaware Corporation, on March 14, 1984.  Michigan Airgas, Inc. was authorized to do business in Michigan on March 16, 1984, and subsequently purchased the stock of Kenneth A. Keeley's business.  Michigan Airgas, Inc., which initially employed Kenneth A. Keeley, changed its name to Airgas-Michigan, Inc., and then Airgas-Great Lakes, Inc., and continues to operate as such in the Lower Peninsula of Michigan.  Airgas-Great Lakes, Inc. and Airgas, Inc. maintain separate corporate bodies, separate boards of directors and distinct operations.  Airgas, Inc. is a Delaware corporation with its corporate headquarters located at 259 N. Radnor-Chester Road, Suite 100, Radnor, Pennsylvania 19087.  Airgas, Inc. is not authorized to conduct business within the State of Michigan.  Airgas, Inc. does not manufacture, sell or distribute products in the State of Michigan and is not engaged in the business of placing products into the stream of commerce within the State of Michigan.  Airgas, Inc. does not maintain any offices in Michigan, does not have any employees in Michigan, does not maintain a telephone listing in Michigan, does not have a mailing address in Michigan, and does not solicit business in Michigan. . . . All or substantially all persons with information about Airgas, Inc.'s adoption of the 1984 Stock Option Plan and its amendments and operations reside in states other than Michigan.

[Court Doc. No. 14-2, Affidavit of Robert H. Young, Jr. ("Young Aff.")].  Airgas argues that it merely owns the stock of a subsidiary corporation, Michigan Airgas, Inc., which purchased Plaintiff's companies' stock.  The company continues to operate in the lower peninsula of Michigan as Airgas-Great Lakes, Inc.

Plaintiff responds to the motion to dismiss with his own affidavit, which states in pertinent part:

> I worked for a subsidiary of the Defendant in Bay City, Michigan from 1984 until my retirement on May 31, 1997.  I have lived in the Upper Peninsula of Michigan since July [19]98.  I received all of the stock option grants that are the subject of this litigation directly from the Defendant Airgas, Inc. each year.  I was usually informed in a letter to me from Peter McCausland, Chairman of Defendant Airgas, Inc., of the award and some terms relating to the stock options that are the subject of this case.  All of the letters were addressed to me at my office in Bay City, Michigan, and were sent from Radnor, Pennsylvania, the corporate headquarters of Airgas, Inc.
> I was informed in the letters that it was Airgas, Inc's management and the

Nominating and Compensation Committee of the Board of Directors of Airgas, Inc. that granted me the stock options. I was informed in letters dated May 13, 1994 that: "Your performance has helped strengthen Airgas and this award represents the Company's recognition of this as well as your potential for making significant contributions in the years ahead. These stock options provide you, as one of our key employees, with added incentive to pursue the profitable growth of the Company." I interpreted "Company" to be Airgas, Inc.

 The letters dated May 13, 1994 also stated: "Your stock option award is governed by the enclosed 1984 Stock Option Plan." That Plan was an Airgas, Inc. plan and was administered by a committee of the Airgas, Inc. Board of Directors. The letters dated May 13, 1994 also stated: "The option is exercisable only after you have agreed to be bound by all of the terms and conditions of this stock option agreement letter (the "Option Agreement") which states the number of shares to which the option pertains. This Option Agreement must be signed before you exercise the option." The letters dated May 13, 1994 also stated: "Please return an acknowledged copy of this letter to Todd R. Craun, Esq. at the Airgas office in Radnor, Pennsylvania in the enclosed, self-addressed envelope." Todd Craun at the time was attorney of Airgas, Inc.

 I also received from Airgas, Inc. on a number of occasions prior to my retirement a summary of outstanding options. To the best of my knowledge, employees around the State of Michigan have received stock options directly from Airgas, including the Western District of Michigan. There are Airgas stores serving the public around the State of Michigan, including in the Western District of Michigan. The Airgas website says that there are Airgas fill stations, retail stores, equipment rental, branches and medical branches at a number of locations throughout the State of Michigan, including a fill plant, 3 branches, an equipment rental location and medical branch in the Upper Peninsula of Michigan. I do not know which Airgas corporate entity owns them.

[Court Doc. No. 17-2, Affidavit of Kenneth A. Keeley ("Keeley Aff.")].

 Plaintiff does not dispute Airgas' factual contentions. He maintains that he received the stock options at issue in this case from Defendant Airgas, rather than from the subsidiary for whom he worked. He contends that this contact alone, as well as Airgas' issuance of other stock options to other employees of its Michigan subsidiaries provides enough contacts to establish personal jurisdiction. He asserts that Airgas filling stations, retail stores, equipment rental stores, and medical branches are located throughout Michigan, but that he is not aware of whether Defendant owns these entities or whether a subsidiary owns them.

-4-

In response to this court's order requesting additional evidentiary materials, Plaintiff filed

an additional affidavit detailing his role in the management of Defendant Airgas.  [Court Doc.

No. 27-1, Second Affidavit of Kenneth A. Keeley ("Second Keeley Aff.")].  The supplemental

affidavit states in part:

> I was a member of the management committee of Airgas Inc. for 10 to 12 years
> ending about 1996.  In that capacity during much of that term I ran the
> administrative part of Airgas Inc. management meetings.
> Starting in 1987 or 1988 my paycheck started coming from Airgas Inc. and I was
> thereafter paid by Airgas Inc. until I retired in 1997.
> During the period 1984 to 1997 I was living and working in Michigan.  I was
> conducting business on behalf of Airgas Inc. and its subsidiaries throughout the
> state of Michigan, including the area within the United States District Court for
> the Western District of Michigan

.

Second Keeley Aff., ¶¶ 2-3, 5.  Plaintiff also attaches a letter from Airgas' corporate headquarters

in Radnor, Pennsylvania inviting him to the annual stockholder meeting, as well as a proxy

statement that was "furnished in connection with the solicitation of proxies at the direction of the

Board of Directors of Airgas, Inc. (the "Company") for use at the Annual Meeting of

Stockholders to be held on August 7, 1995." [Court Doc. No. 27-3 ("Proxy Statement")].  The

Proxy Statement contains the following summary under the heading "Executive Compensation":

> The following table sets forth certain information concerning the compensation
> paid during the fiscal years ended March 31, 1995, 1994 and 1993 to the
> Company's Chief Executive Officer and each of the Company's four other most
> highly compensated executive officers based on salary and bonus earned during
> the 1995 fiscal year.

*Id.*  Underneath the "Summary Compensation Table" beneath compensation summaries for the

Chairman, President and Chief Executive Officer and the Vice President of Finance for Airgas,

Plaintiff's own compensation is listed and his title is noted as "Division President – Central."  In

fact the summary indicates that Plaintiff was the "Company's" third "most highly compensated

executive officer[ ] based on salary and bonus earned during the 1995 fiscal year." *Id.* Plaintiff

is also listed in a table summarizing "information related to options granted to the named

executive officers during fiscal 1995." *Id.*

In response to this court's order, Airgas also supplemented the record by filing a copy of

its 2008 Annual Report. [Court Doc. No. 23-2 ("Annual Report")]. A review of the Annual

Report reveals that revenue from all of the subsidiaries is combined into Airgas' overall revenue

numbers. For instance, it states that "Airgas is the largest U.S. distributor of packaged gases and

welding hardgoods." Annual Report, p. 15. It further reveals a map of the United States with all

of the Airgas locations pinpointed on the map, stating that Airgas is "[k]nown locally nationwide,

with more than 1,100 locations." *Id.* The financial highlights page indicates the financial

summary for "Airgas, Inc. and Subsidiaries." *Id.* at p. 17. In the overview of financial results,

Airgas and its subsidiaries collectively define the "Company": "Airgas, Inc., and its subsidiaries

("Airgas" or the "Company") had net sales for the fiscal year ended March 31, 2008 ("fiscal

2008" or "current year") of $4 billion compared to $3.2 billion for the fiscal year ended March

31, 2007 . . . ." *Id.* at p. 19.

The Annual Report shows combined financing for "Airgas, Inc. and Subsidiaries,"

including combinations such as "contractual obligations." Annual Report, p. 31. The company

further asserts that it maintains integrated control:

> Management of Airgas, Inc. and subsidiaries (the "Company") prepared and is
> responsible for the consolidated financial statements and related financial
> information in this Annual Report. The statements are prepared in conformity
> with U.S. generally accepted accounting principles. The financial statements
> reflect management's informed judgment and estimation as to the effect of events
> and transactions that are accounted for or disclosed.
> Management maintains a system of internal control, which includes internal
> control over financial reporting, at each business unit. The Company's system of

internal control is designed to provide reasonable assurance that records are
maintained in reasonable detail to properly reflect transactions . . . .

Annual Report, p. 34.

In its Summary of Significant Accounting Policies, the Annual Report states:

Airgas, Inc. and subsidiaries ("Airgas" or the "Company") became a publicly
traded company on the New York Stock Exchange in 1986.  Since its inception,
the Company has made close to 375 acquisitions to become the largest distributor
of industrial, medical, and specialty gases (delivered in "packaged" or cylinder
form), and hardgoods, such as welding equipment and supplies.  Airgas is also
one of the largest U.S. distributors of safety products, the largest U.S. producer of
nitrous oxide and dry ice, the largest liquid carbon dioxide producer in the
Southeast, the fifth largest producer of atmospheric merchant gases in North
America, and a leading distributor of process chemicals, refrigerants, and
ammonia products.  The Company markets its products to its diversified customer
base through multiple sales channels including branch-based sales representatives,
retail stores, strategic customer account programs, telesales, catalogs, eBusiness
and independent distributors.  More than 14,500 employees work in over 1,100
locations including branches, retail stores, packaged gas fill plants, specialty gas
labs, production facilities, and distribution centers.

Annual Report, p. 41.  In discussing the acquisition of another company in 2007, the Annual

Report noted that "[a]s of September 30, 2007, pursuant to the Company's plan to integrate the

Linde Packaged Gas business into its regional company structure, the Company recorded initial

estimates related to the integration plan." *Id.* at p. 46.  The Annual Report further details its

Employee Stock Purchase Plan for all employees, its "Company" "self-insured health benefits

plan"and its "defined contribution 401(k) plan . . . covering substantially all full-time

employees." *Id.* at pp. 57, 59, 60.  The Annual Report clarifies that "[t]he Company aggregates

its operations, based on products and services, into two reportable business segments,

Distribution and All Other Operations." *Id.* at p. 61.  Similarly, Airgas' Form 10-K filed with the

United States Securities and Exchange Commission shows consolidated information for Airgas

and its subsidiaries. *See* [Court Doc. No. 23-3].

-7-

## II.      Standard of Review

### A.      Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) allows a party to bring a motion to dismiss for

lack of personal jurisdiction.  Fed.R.Civ.P. 12(b)(2).  As the Sixth Circuit has explained:

> The procedural scheme which guides the district court in disposing of Rule
> 12(b)(2) motions is well-settled.  The plaintiff bears the burden of establishing
> that jurisdiction exists.  Additionally, in the face of a properly supported motion
> for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or
> otherwise, set forth specific facts showing that the court has jurisdiction. . . .
>
> Presented with a properly supported 12(b)(2) motion and opposition, the court has
> three procedural alternatives: it may decide the motion upon the affidavits alone;
> it may permit discovery in aid of deciding the motion; or it may conduct an
> evidentiary hearing to resolve any apparent factual questions.  The court has
> discretion to select which method it will follow, and will only be reversed for
> abuse of that discretion.  However, the method selected will affect the burden of
> proof the plaintiff must bear to avoid dismissal.  The record and the text of the
> order in this case plainly indicate that the district court reached its decision based
> upon the parties' affidavits.  The court expressly denied Appellant's request for
> further discovery and apparently received no testimony or other evidence at the
> hearing on the matter.  Where the court relies solely on the parties' affidavits to
> reach its decision, the plaintiff must make only a *prima facie* showing that
> personal jurisdiction exists in order to defeat dismissal.

*Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citations omitted).  The court in

*Theunissen* compared the district court's review of a 12(b)(2) motion to a motion for summary

judgment:

> The court's treatment of a motion under Rule 12(b)(2) mirrors in some respects
> the procedural treatment given to a motion for summary judgment under Rule 56.
> For example, the pleadings and affidavits submitted on a 12(b)(2) motion are
> received in a light most favorable to the plaintiff.  In sharp contrast to a summary
> judgment procedure, however, the court disposing of a 12(b)(2) motion does not
> weigh the controverting assertions of the party seeking dismissal.  We adopted
> this rule in *Serras* in order to prevent non-resident defendants from regularly
> avoiding personal jurisdiction simply by filing an affidavit denying all
> jurisdictional facts, as the Appellee has done in the case before us.

-8-

*Id.* at 1459 (citing *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)) (other citations omitted).

In analyzing whether personal jurisdiction exists, the Sixth Circuit has found that "[p]ersonal jurisdiction over an out-of-state defendant arises from 'certain minimum contacts with [the forum] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Air Products and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544 (6th Cir. 2007) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

Plaintiff bears the burden of demonstrating personal jurisdiction.  *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002); *Pride Distributors, Inc. v. Nuzzolo*, No. 05-cv-7441-DT, 2007 WL 1098286 (E.D. Mich. Apr. 10, 2007).  If a district court does not conduct an evidentiary hearing on personal jurisdiction when considering the motion to dismiss, a plaintiff must demonstrate only a prima facie showing of personal jurisdiction.  *Neogen Corp.*, 282 F.3d at 887.  A plaintiff "can meet this burden by 'establishing with reasonable particularity sufficient contacts between [the defendant] and the forum state to support jurisdiction.'" *Id.* (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)).  The court must consider the facts in the light most favorable to the nonmoving party and must not consider conflicting facts offered by the defendant.  *Neogen Corp.*, 282 F.3d at 887.

**B.     Venue**

Defendant also seeks dismissal for improper venue.  Federal Rule of Civil Procedure 12(b)(3) provides for dismissal based on improper venue.  Fed.R.Civ.P. 12(b)(3).  Further, 28 U.S.C. § 1391(b)-(c) provides:

> (b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

> (c) For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.  In a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

28 U.S.C. § 1391(b)-(c); *see also, First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998).

> On a motion to dismiss for improper venue, the plaintiff bears the burden of proving that venue is proper.  The Court may examine facts outside the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff.  If a defendant prevails on a Rule 12(b)(3) challenge, the Court has the discretion to decide whether the action should be dismissed or transferred to an appropriate court.

*Audi AG & Volkswagen of America, Inc. v. Izumi*, 204 F.Supp.2d 1014, 1017 (E.D. Mich. 2002) (citations omitted).

### III.    Analysis

Federal Rule of Civil Procedure 4(k)(1)(A) provides that personal jurisdiction must be based on the law of the forum state.  Thus, Michigan's long-arm statute must apply in this case. The Sixth Circuit "historically has understood Michigan to intend its long-arm statute to extend to the boundaries of the fourteenth amendment."  *Theunissen*, 935 F.2d at 1462; *see also, Serras*,

875 F.2d at 1216 (noting that the state of Michigan has determined that the long-arm statute

"shall extend to the outermost boundaries permitted by the due process clause," but that the

"state retains the power to restrict long-arm jurisdiction, so that it falls short of the maximum

permitted by the federal constitution–and in at least one area Michigan has chosen to exercise

that power").

> Michigan's statute relating to general personal jurisdiction over corporations states:
>
> The existence of any of the following relationships between a corporation and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise general personal jurisdiction over the corporation and to enable such courts to render personal judgments against the corporation.
> (1) Incorporation under the laws of this state.
> (2) Consent, to the extent authorized by the consent and subject to the limitations provided in section 745.
> (3) The carrying on of a continuous and systematic part of its general business within the state.

Mich. Comp. Laws § 600.711. Michigan's statute relating to specific jurisdiction states:

> The existence of any of the following relationships between a corporation or its agent and the state shall constitute a sufficient basis of jurisdiction to enable the courts of record of this state to exercise limited personal jurisdiction over such corporation and to enable such courts to render personal judgments against such corporation arising out of the act or acts which create any of the following relationships:
>
> (1) The transaction of any business within the state.
> (2) The doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.
> (3) The ownership, use, or possession of any real or tangible personal property situated within the state.
> (4) Contracting to insure any person, property, or risk located within this state at the time of contracting.
> (5) Entering into a contract for services to be performed or for materials to be furnished in the state by the defendant.

Mich. Comp. Laws § 600.715.  As the Sixth Circuit has noted, "[t]he Michigan Supreme Court

has declared that the 'transaction of any business within the state' is intended to be

comprehensive: 'The word 'any' means just what it says.  It includes 'each' and 'every' . . . It comprehends 'the slightest'.'" *Serras*, 875 F.2d at 1217 (citing *Sifers v. Horen*, 188 N.W.2d 623, 624 n.2 (Mich. Sup. Ct. 1971)).

In addition to satisfying Michigan law, jurisdiction over a non-resident must also satisfy due process concerns.  Due process concerns will be met as long as a "defendant has 'certain minimum contacts' with the forum such that the exercise of personal jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Cupp v. Alberto-Culver USA, Inc.*, 308 F.Supp.2d 873, 877 (W.D. Tenn. 2004) (quoting *International Shoe Co.*, 326 U.S. at 316). Personal jurisdiction must be either general or specific.  General jurisdiction may exist where a defendant "has continuous and systematic contacts with the forum state sufficient to justify the state's exercise of judicial power with respect to any and all claims the plaintiff may have against the defendant . . ." *Kerry Steel, Inc. v. Paragon Indust., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997) (citing *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 US. 408, 414-415 & nn. 8-10 (1984)).

Specific jurisdiction, on the other hand, "exposes the defendant to suit in the forum state only on claims that 'arise out of or relate to' a defendant's contacts with the forum." *Kerry Steel, Inc.*, 106 F.3d at 149 (quoting *Helicopteros Nacionales*, 466 U.S. at 414-415).  The Sixth Circuit has established a three-part test to determine whether specific jurisdiction exists:

> First the defendant must purposely avail himself of the privilege of acting in the forum state or causing a consequence in the forum state.  Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (quoting *Southern Machine Co.*

*v. Mohasco Indust., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).  In analyzing specific jurisdiction

within Michigan, the Michigan Supreme Court has noted:

> A "purposeful availment" is something akin either to a deliberate undertaking to
> do or cause an act or thing to be done in Michigan or conduct which can be
> properly regarded as a prime generating cause of the effects resulting in Michigan,
> something more than a passive availment of Michigan opportunities.  The
> defendant will have reason to foresee being "haled before" a Michigan court.

*Khalaf v. Bankers & Shippers Ins. Co.*, 273 N.W.2d 811, 819 (Mich. Sup. Ct. 1978).

> Further, [t]his 'purposeful availment' requirement ensures that a defendant will
> not be haled into a jurisdiction solely as a result of 'random,' fortuitous,' or
> 'attenuated' contacts, or of the 'unilateral activity of another party or a third
> person, . . . . Jurisdiction is proper, however, where the contacts proximately result
> from actions by the defendant *himself* that create a 'substantial connection' with
> the forum State.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76, 105 S.Ct. 2174 (1985) (quotations and

citations omitted).

In *Witbeck v. Bill Cody's Ranch Inn*, 411 N.W.2d 439 (Mich. Sup. Ct. 1987) the

Michigan Supreme Court reviewed whether residents of Michigan could sue a Wyoming ranch

based on injuries sustained while the family visited the ranch in Wyoming.  The court determined

that the ranch's limited contacts with the family were insufficient to establish personal

jurisdiction:

> If personal jurisdiction were to be based upon a single phone call, of course, such
> a holding would burden businesses in Michigan as well as in other states.  It
> would mean that any Michigan business which received an interstate phone call
> would subject itself to the jurisdiction of the state from which that call emanated.
> Other courts have considered this proposition in light of due process requirements
> and have concluded that such a phone call will not support jurisdiction.  Likewise
> the interstate posting of a brochure in response to plaintiffs' phone call does not
> constitute "purposeful availment" of the forum state. . . . We conclude that the
> lone advertisement, the single unsolicited phone call, and the mailing of a
> brochure do not, separately or collectively, satisfy the "minimum contacts"
> threshold which protects nonresidents under the federal Due Process Clause.

> Such tenuous threads, which purportedly link the defendant to Michigan, are not "akin . . . to a deliberate undertaking to do or cause an act or thing to be done in Michigan . . . ."

*Id.* at 673-74 (quoting *Khalaf v. Bankers & Shippers Insur. Co.*, 273 N.W.2d 811 (Mich. Sup. Ct. 1978) (other citations omitted)).  Further, "a company does not purposefully avail itself of the forum merely by owning some or all of a corporation subject to jurisdiction in the forum."  *Cupp*, 308 F.Supp.2d at 878 (citing *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1273-74 (6th Cir. 1998)).  Nor does merely entering into a contract with an out-of-state party mean that an individual has purposely availed itself of the forum state's protection.  *See Kerry Steel, Inc. v. Paragon Indust., Inc.*, 106 F.3d 147, 151 (6th Cir. 1997); *Burger King v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 2185 (1985).

However, where an individual does more than merely own stock in a corporation, such individual may be subject to personal jurisdiction in a foreign forum.  For example, in *American Greetings Corp. v. Cohn*, the Sixth Circuit determined that a district court in Ohio could assert personal jurisdiction over a California resident where the defendant

> himself originated and maintained the required contacts with Ohio by his letters and telephone calls to [plaintiff] and by designating his brother, an Ohio resident, and an Ohio attorney to pursue his claims with [plaintiff] in Ohio.  In these contacts [defendant] did much more than argue that the amendment to the plaintiff's articles was illegal.  He threatened to sue [plaintiff] and sought a substantial sum of money to forego his claim.

839 F.2d 1164, 1170 (6th Cir. 1988).  In addition, if "a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an [out-of-state] resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in [that particular state]. . . . Furthermore, if the cause of action is for breach of that contract, as it is here, then the cause of action naturally arises from the defendant's

-14-

activities in [the state]." *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998) (citations omitted).

Courts must "evaluate 'prior negotiations and contemplated future consequences, along with the

terms of the contract and the parties' actual course of dealing . . . .'" *Reynolds v. Int'l Amateur*

*Athletic Federation*, 23 F.3d 1110, 1118 (6th Cir. 1994) (quoting *Burger King*, 471 U.S. at 479,

105 S.Ct. at 2185).  In addition, "the regular buying and selling of goods pursuant to a

contractual arrangement" may support personal jurisdiction over a nonresident defendant.  *Chase*

*Plastic Serv., Inc. v. Brahm Indust. Inc.*, No. CIV 06-12539, U.S. Dist. LEXIS 8361, *14 (E.D.

Mich. Feb. 6, 2007).

 Airgas relies on law pertaining to the theory of holding an owner corporation responsible

for the acts of its subsidiary, otherwise known as piercing the corporate veil, for support of its

position.  The Michigan Supreme Court has explained that:

> We recognize the general principle that in Michigan separate entities will be
> respected.  However, the fiction of a distinct corporate entity separate from the
> stockholders is a convenience introduced in the law to subserve the ends of
> justice.  When this fiction is invoked to subvert justice, it is ignored by the courts.
> This of course means that, in general, even though Firestone is the parent
> company of Muskegon Firestone, its separate existence will be respected, unless
> doing so would subvert justice or cause a result that would be contrary to some
> other clearly overriding public policy.

*Wells v. Firestone Tire & Rubber Co.*, 364 N.W.2d 670, 674 (Mich. Sup. Ct. 1984) (citations

omitted).  *See also*, *Helzer v. F. Joseph Lamb Co.*, 429 N.W.2d 835, 837 (Mich. Ct. App. 1988).

Michigan courts have further explained:

> In order to establish a cause of action because a subsidiary is a mere
> instrumentality of its parent, the following must be proved: (1) control by the
> parent to such a degree that the subsidiary has become its mere instrumentality;
> (2) fraud or wrong by the parent through its subsidiary; and (3) unjust loss or
> injury to the claimant.

*Maki v. Copper Range Co.*, 328 N.W.2d 430, 433 (Mich. Ct. App. 1982) (citations omitted).

-15-

Even "100% control through stock ownership does not by itself make a subsidiary the alter ego of the parent." *Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003) (citing *Bellomo v. Pennsylvania Life Co.*, 488 F.Supp. 744, 745 (S.D.N.Y. 1980) and *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250 (1925)).

However, piercing the corporate veil analysis is not the appropriate analysis to use when determining whether a parent corporation is subject to personal jurisdiction.  As one district court in this Circuit noted:

> The formalistic approach of the alter ego doctrine, is irrelevant to the question whether the exercise of jurisdiction over an absent parent corporation would violate the Due Process Clause.
>
> Concededly, a corporation's relationship with an affiliated corporation in the forum is relevant to the due process question in a manner different from that in which it pertains to the corporate law question of alter ego relationships and "veil piercing."  For alter ego purposes the nature of the relationship–the identity between the corporations is alone controlling.  For jurisdictional purposes, the fact of the existence of the relationship . . . is a minimum "contact, tie or relation" with the forum that may render possible the constitutional exercise of jurisdiction if the relevant factors, including both convenience and the orderly administration of the laws balance in that direction.

*In re Telectronics Pacing Systems, Inc.*, 953 F.Supp. 909, 915 (S.D. Ohio 1997); *see also, Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1098-99 (C.D. Cal. 2003).

As the Sixth Circuit explained:

> The International Shoe decision represented an effort by the Supreme Court to clarify earlier concepts in the area of the amenability of foreign corporations to the personal jurisdiction of state courts by sweeping aside any lingering notions that the earlier shibboleths of 'consent,' 'presence,' and 'doing business' were self-defining abstractions, and by redefining those tests in terms of 'minimum contacts.'  Following this decision it would seem appropriate, for the purpose of determining the amenability to jurisdiction of a foreign corporation which happens to own a subsidiary corporation carrying on local activities, to inquire whether the parent has the requisite minimum contacts with the State of the forum.

-16-

*Velandra v. Regie Nationale Des Usines Renault*, 336 F.2d 292, 297 (6th Cir. 1964).  Further,

> [m]ere ownership of a subsidiary that conducts business in the forum state is one
> factor which weighs in favor of sufficient minimum contacts, but it is not of itself
> significant enough to establish personal jurisdiction over the parent corporation.
> However, a court may also exert jurisdiction over a parent corporation for the acts
> of its subsidiary based on the theories of attribution or merger.  Attribution can be
> explained as follows:
>
> > The attribution test implies that the in-forum subsidiary is acting
> > on behalf of the absent parent.  Thus, the Court attributes the
> > subsidiary's contacts to the parent because the parent "purposefully
> > avails" itself of doing business in the forum by accessing the
> > market through a subsidiary.
>
> Under the merger theory, the two entities are so closely aligned that it is
> reasonable for the parent to anticipate being haled into court in the forum because
> of its relationship with the subsidiary.

*Niemi v. NHK Spring Co. Ltd.*, 276 F.Supp.2d 717, 721 (E.D. Mich. 2003) (quoting *In re*

*Telectronics Pacing Systems, Inc.*, 953 F.Supp. at 919); (citing *Velandra*, 336 F.2d at 297).

This case appears highly similar to another district court case involving a parent-

subsidiary relationship, *Sehringer v. Big Lots, Inc.*, 532 F.Supp.2d 1335 (M.D. Fla. 2007).  In

that case the district court adopted the magistrate judge's recommendation that the court exert

personal jurisdiction over a parent corporation.  The action involved an alleged breach of contract

regarding stock options provided to the plaintiff by the defendant parent corporation.  *Id.* at 1338.

The parent corporation operated more than 100 subsidiary retail stores in the state of Florida.  *Id.*

The plaintiff was a former district manager of the subsidiary in Florida who received stock of the

parent corporation.  *Id.* at 1340.  After the plaintiff's retirement, he attempted to exercise his

stock options, but the parent corporation refused to let him exercise the options, claiming that the

performance incentive plan did not allow him to exercise the options later than three months after

his termination from the subsidiary.  *Id.*  The defendant parent corporation claimed that personal

jurisdiction over the company did not exist in Florida because it did not operate or engage in

business in Florida, had no registered agent in Florida, and was an Ohio corporation.  *Id.*  The

magistrate judge analyzed the parent corporation's annual report and Form 10-K report for

evidence that the parent corporation controlled the subsidiary retail stores.  He found it

persuasive that the parent corporation issued its stock to employees of the subsidiary retail stores.

*Id.* at 1343.  He also found it persuasive that the annual report discussed the employees of the

subsidiary stores as if they were part of one large, cohesive group.  *Id.*  The parent corporation's

Form 10-K noted that the parent operated 1,375 stores in 47 states.  *Id.*   In determining that

personal jurisdiction existed, the magistrate noted:

> Big Lots Stores, Inc. is a wholly-owned subsidiary of Defendant Big Lots, Inc.
> Big Lots, Inc.'s Form 10-K lists 104 retail outlets in that state of Florida as of
> February 3, 2007.  The opening sentence of Big Lots, Inc.'s Form 10-K company
> information explains that Big Lots, Inc. and its wholly-owned susidiaries are
> "collectively referred to herein as 'we,' 'us,' 'our,' or 'Company.'"  From
> beginning to end, Big Lots, Inc.'s Form 10-K makes no differentiation between
> Big Lots, Inc. and its subsidiary corporations, including Big Lots retail stores
> located in Florida.  The information contained in the Form 10-K and its
> attachments shows that Big Lots, Inc. not only operates "a total of 1,375 stores in
> 47 states," but exercises control over the "merchandise available in [its] stores,"
> including "store promotions, [and] in-store signage," and uses "national television
> advertising that covers all stores in all markets." . . .
> Big Lots, Inc. also directly compensates employees of its subsidiary retail stores
> through the 1996 Performance Incentive Plan, as amended, and offers a Pension
> Plan to certain eligible employees. . . . The fact that Big Lots, Inc. would
> compensate employees of its subsidiary suggests a strong unity of financial
> interest between Big Lots, Inc. and its subsidiary retail stores.

*Id.* at 1347.  The magistrate further explained:

> Plaintiff's stock options, and the concomitant contract, were obtained as
> compensation for Plaintiff's employment at Big Lots retail locations, under Big
> Lots Stores, Inc., as wholly-owned subsidiary of Defendant Big Lots, Inc.  The
> stock options were provided directly to Plaintiff from Defendant Big Lots, Inc.,
> not through a subsidiary, and were part of a detailed, corporation-wide incentive
> plan, approved and renewed by Big Lots, Inc. shareholders.

*Id.* at 1347.

This case is strikingly similar to the *Big Lots, Inc.* case. In this action Plaintiff has submitted a copy of the 1995 Proxy Statement which lists Plaintiff as the third-highest paid executive at Airgas, Inc. [Court Doc. No. 27-3]. Like the district manager in *Big Lots, Inc.* Airgas compensated Plaintiff with its own stock options. Airgas' Annual Report is replete with examples that it considers its subsidiary corporations to be part of the overall "Company." All of the assets and liabilities, as well as income and acquisitions are combined. *See* Annual Report. The report touts that Airgas is "[k]nown locally nationwide, with more than 1,100 locations." *Id.* The overview section of the report indicates that "Airgas, Inc. and its subsidiaries ("Airgas" or the "Company") had net sales for the fiscal year ended March 31, 2008 . . . of $4 billion . . . . *Id.* at p.19. The report emphasizes that "[m]anagement maintains a system of internal control, which includes internal control over financial reporting, at each business unit." *Id.* at p. 34. As in *Big Lots, Inc.* Airgas combines its retail outlets under one broad "Company" umbrella: "More than 14,500 employees work in over 1,100 locations including branches, retail stores, packaged gas fill plants, specialty gas labs, production facilities, and distribution centers." Annual Report, p. 41.

As the magistrate judge concluded in *Big Lots, Inc.* this court also concludes that Airgas' identity is merged enough with its subsidiaries to be subject to personal jurisdiction, either general or specific, in this court. Upon review of the Annual Report and the Form 10-K, it is apparent that Airgas considers itself and all of its subsidiaries to be one comprehensive "Company" with combined income, expenses, and liabilities. The subsidiary corporations are not delineated in any way, and employees receive Airgas stock as compensation, as well as

benefits under one "self-insured health benefits plan" and one 401(k) plan "covering substantially all full-time employees." Annual Report, pp. 59, 60. Thus, it is clear that Airgas, Inc. and Airgas' Michigan subsidiaries' interests are so closely aligned that they are effectively merged. Airgas' emphasis on the "Company's" national presence in numerous markets indicates that it has "purposely availed" itself of doing business in Michigan and could thus expect to be haled into court there.

A map of Airgas' facilities demonstrates that Airgas maintains several locations in the state of Michigan and within the Western District, and it even has one outlet in the Upper Peninsula of the state. Annual Report, p. 15. This is sufficient to satisfy the requirements of either general or specific personal jurisdiction. Airgas clearly transacts business in the state of Michigan and has purposefully availed itself of Michigan's laws to facilitate its business. Further, Airgas mailed its stock options to Plaintiff's home in the Upper Peninsula, and this action revolves around the alleged breach of those stock option agreements. Moreover, it comports with fair play and substantial justice to require Airgas to defend itself in this court, as Airgas clearly has several retail outlets within the state and conducts business in Michigan on a regular basis. This court concludes that it can assert personal jurisdiction over Defendant Airgas in this action. Airgas' motion to dismiss for lack of jurisdiction will therefore be **DENIED**.

### B. Venue

Pursuant to 28 U.S.C. § 1391(c), if this court has personal jurisdiction over a corporation, then it also has venue over the corporation. *See* 28 U.S.C. § 1391(c). Airgas' Annual Report pinpoints several different Michigan locations for Airgas services, including one in the Upper Peninsula. Annual Report, p. 15. For the same reasons that this court determined personal

jurisdiction is appropriate, it has determined that venue is proper pursuant to 28 U.S.C. §§
1391(b)-(c). Airgas controls all of its subsidiaries and does not differentiate between its interests
and the interests of its subsidiaries in its Annual Report or its Form 10-K. As a district court in
this Circuit noted, "if a corporate defendant is subject to personal jurisdiction in a judicial
district, it is deemed to reside there for purposes of venue." *Centerville ALF, Inc. v. Balanced
Care Corp.*, 197 F.Supp.2d 1039, 1048 (S.D. Ohio 2002).

  Further, as Airgas itself points out, Plaintiff brings some claims pursuant to ERISA,
which contains a broad venue provision. The statute states:

> Where an action under this subchapter is brought in a district court of the United
> States, it may be brought in the district where the plan is administered, where the
> breach took place, or where a defendant resides or may be found, and process may
> be served in any other district where a defendant resides or may be found.

29 U.S.C. § 1132(e)(2). The Sixth Circuit has determined that "[a] defendant 'resides or may be
found,' for ERISA venue purposes, in any district in which its 'minimum contacts' would
support the exercise of personal jurisdiction." *Moore v. Rohm & Haas Co.*, 446 F.3d 643 (6th
Cir. 2006) (citing *Waeltz v. Delta Pilots Ret. Plan*, 301 F.3d 804, 809-10 (7th Cir. 2002); *Varsic v.
United States District Court*, 607 F.2d 245, 248-49 (9th Cir. 1979)). The Sixth Circuit further
noted that:

> The minimum contacts standard, in turn, is satisfied when the "defendant's
> contacts with the forum state are 'substantial' and 'continuous and systematic,' so
> that the state may exercise personal jurisdiction over the defendant even if the
> action does not relate to the defendant's contacts with the state." Here, it is
> undisputed that, by virtue of its two operating salt-processing plants, [defendant]
> has minimum contacts with the Northern District of Ohio. Accordingly venue
> over plaintiffs' ERISA claim is proper in the district court.

*Moore*, 446 F.3d at 646-47.

  This court has already determined that Airgas, Inc., through its subsidiaries, by which it

defines itself, has several retail outlets in the Western District of Michigan.  Thus, venue is
proper in this court for Plaintiff's claims.

###### C.      Motion to Strike Jury Demand

Although Airgas moves to strike Plaintiff's jury demand, a review of the complaint
reveals that Plaintiff has brought a number of claims against Airgas, including breach of express
and implied contract, violation of ERISA, violation of various federal and state securities laws,
conversion, misrepresentation and fraudulent concealment.  Complaint.  As courts in this Circuit
have noted, "[i]f a case involves both legal and equitable issues, the right to a jury trial on the
legal issues still exists."  *Stasiak v. Loomis Armored, Inc.*, 706 F.Supp. 22, 23 (E.D. Mich. 1987)
(citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 471, 82 S.Ct. 894 (1962)).  Federal Rule of
Civil Procedure 18 provides that "[a] party asserting a claim, counterclaim, crossclaim, or third-
party claim may join, as independent or alternative claims, as many claims as it has against an
opposing party."  Fed. R. Civ. P. 18(a).  As the Sixth Circuit has noted:

> The Court has long indicated that a district court cannot properly deny a litigant a
> trial on legal issues by characterizing those issues as merely "incidental to," or
> insignificant in comparison to, equitable issues.  Once a court determines that a
> case involves legal issues, the litigants have a right to a jury trial on those issues,
> regardless of how insignificant they may appear in relation to equitable issues.  A
> district court violates this precedent when it determines that there are legal issues
> in the case and denies a jury trial nonetheless.

*Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 660 (6th Cir. 1996) (citing *Curtis v. Loether*, 415 U.S.
189, 196 n.11, 94 S.Ct. 1005, 1009 n. 11 (1974); *Dairy Queen, Inc.*, 369 U.S. at 473, 82 S.Ct. at
897) (other citations omitted).

Under Michigan law, "it is well-established that the remedy for breach of contract can
include money damages, injunctive relief, or both."  *Saab v. Farah*, No. 04-079096-CK, 2008

WL 4605920 *7 (Mich. App. Oct. 2, 2008).  Where a party has requested damages associated with an alleged breach of contract, that party has raised legal issues that are entitled to be submitted to a jury.  *See Gelman Sciences, Inc. v. Fireman's Fund Ins. Cos.*, 455 N.W.2d 328, 331 (Mich. Ct. App. 1990).  In this action, Plaintiff seeks monetary damages for such alleged violations as breach of contract and misrepresentation.  He is entitled to a jury trial on the legal issues he has raised.  The court will therefore **DENY** Airgas' motion to strike Plaintiff's jury demand.

### IV.    Conclusion

For the reasons stated *supra*, the court will **DENY** Airgas' motion to dismiss and motion to strike Plaintiff's jury demand.

A separate order will enter.


Dated: 12/29/08                                     /s/ R. Allan Edgar
                                                   R. ALLAN EDGAR
                                                   UNITED STATES DISTRICT JUDGE